BAY STATE GAS CO. OF DELAWARE v. ROGERS.

(Circuit Court, D. Massachusetts. July 18, 1906.)

No. 90.

**1. CORPORATIONS—RECEIVERS—APPOINTMENT—AUTHORITY TO SUE.**

A receiver was appointed for a corporation in the domiciliary district, and thereafter an ancillary appointment was made by the Circuit Court of the District of Massachusetts. The order of ancillary appointment expressly gave the receiver all powers described in the order of original appointment, which authorized him to institute actions or suits in any court for the recovery of any estate, property, or demand existing in favor of the corporation. *Held* that, though the receiver's powers were interlocutory, and he was not constituted an assignee or trustee for the purpose of winding up the corporation, he had authority to sue in the federal courts sitting in Massachusetts, in the name of the corporation, to recover profits made by defendant, by virtue of his' control of the corporation as its trustee, for which defendant had not accounted.

[Ed. Note.—Actions by or against receivers of federal courts, see note to J. I. Case Plow Works v. Finks, 26 C. C. A. 49.]

**2. EQUITY—JURISDICTION—RECOVERY OF MONEY.**

Where the subject-matter of a suit consisted of certain gains and profits arising out of a trust, either express or constructive, the fact that the amount claimed could be liquidated in cash, so that the purpose of the

bill in the end was merely a demand for money, did not deprive the federal courts of jurisdiction thereof in equity.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 151, 152; vol. 47, Cent. Dig. Trusts, § 565.]

3. TRUSTS—ACTIONS AGAINST TRUSTEES—PRIVATE PROFITS—ACCOUNTING—PARTIES.

Where suit was brought to recover profits made by one of three trustees, there being no claim that defendant shared the gains and profit sought to be recovered with his co-trustees, they were not necessary parties to the bill, as provided by Rev. St. § 737 [U. S. Comp. St. 1901, p. 587], and Equity Rules 22, 47, and 53.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, §§ 367, 368.]

4. SAME—LACHES.

In a suit in equity brought by a receiver of a corporation to compel an accounting from one who held certain assets in trust for the corporation, in which case it appeared that the facts were not known until after the receiver was appointed, and that there were no peculiar circumstances beyond the delay, held, that the suit was not barred by laches.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 362.]

5. SAME—ACTIVE TRUST.

Where a deed of trust gives in terms to a trustee the entire control and management of certain particularized assets, the trust created thereby is held to have been an active one.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 178.]

6. SAME—OBLIGATIONS OF TRUSTEE DEALING WITH HIS OWN PROPERTY SIMULTANEOUSLY WITH THAT OF A TRUST.

The complainant corporation controlled certain gaslight companies operating in the city of Boston. The defendant had acquired, and still held, controlling interests in two competing gaslight companies operating in that city and its vicinity. Under those circumstances, the complainant corporation, in order to prevent injurious competition, gave the defendant by a deed of trust practical control and management of the companies controlled, by it for a specific term named therein. While the trust still continued, the defendant caused to be executed contracts between the last-named companies and a coke company for the purchase of the gas, which was the expected product of the coke company, and was also expected to afford a sufficient supply. At the same time, the defendant caused to be made like contracts between the coke company and the two companies which he controlled in his own right, and simultaneously therewith he negotiated for and completed a sale of his interests in those two companies at a large profit to himself. The record did not show that he had expressly coupled the two transactions: neither did it show that he advised the complainant corporation in regard to the transactions, or obtained its consent thereto. Held that, under the circumstances, his relations as trustee and to his own property were such that he was holden in equity to account to his cestui que trust for an equitable proportion of the profits derived from the sale of his own interests in excess of a fair return on the cost thereof; and also held that, in the absence of any definite rule by which an equitable apportionment of the profits could be accurately made, the apportionment should be made in moieties, according to judicium rusticum.

In Equity.

Sherman L. Whipple, Frank B. Bracken, and Alexander Lincoln, for complainant.

Alfred Hemenway, James M. Beck, and Walter I. Badger, for defendant.

PUTNAM, Circuit Judge. We do not understand that the parties in this case raise any distinct question with reference to our jurisdiction in equity in regard thereto. Nevertheless, on account of the importance of the topics involved, we deem it better to make it clear that there is no doubt in our own minds on this point.

George Wharton Pepper was appointed the receiver of the complainant corporation by the Circuit Court for this district by an order entered on June 8, 1903. This order gave the receiver full power over "all and singular the properties, choses in action, franchises, and rights" of the corporation, and vested him with full power to demand and receive, and take into his possession, all the same. This appointment was ancillary to his appointment as receiver of the same corporation by the Circuit Court of the United States for the District of Delaware, which was the domiciliary district; and the order in this district expressly gave the receiver all the powers described in the decretal order of the Circuit Court for the District of Delaware. The latter order provided that Pepper as receiver might institute actions at law or suits in equity in any court for the recovery of any estate, property, or demand existing in favor of the corporation; so that there can be no question, so far as it was within the power of the Circuit Court for the District of Massachusetts to authorize Pepper as such receiver to prosecute this suit, he was fully empowered to do so. It is probable that the powers of the receiver were only of an interlocutory nature, and that, so far as the record shows, he was not in any way constituted an assignee or a trustee, or a quasi assignee or quasi trustee, for the purpose of winding up the corporation. What further orders there might have been in that direction, if any, the record does not disclose. It is not important that it should, because, while the bill was originally filed in the name of the receiver, it was afterwards amended, in accordance with the settled practice, so as to become a bill in the name of the corporation, brought by the receiver under the authority of the court. That, under these circumstances, a bill can be so brought and maintained seems to have been settled, so far as the federal courts are concerned, by Davis v. Gray, 16 Wall. 203, 217, 21 L. Ed. 447, and Porter v. Sabin, 149 U. S. 473, 478, 13 Sup. Ct. 1008, 37 L. Ed. 815, and by the long unquestioned practice in that direction; although, of course, under the late decisions of the Supreme Court, especially in Great Western Company v. Harris, 198 U. S. 561, 25 Sup. Ct. 770, 49 L. Ed. 1163, this suit could not have been brought or maintained in the name of the corporation by Pepper simply by virtue of the powers vested in him by the Circuit Court for the District of Delaware.

The bill in this case will be found to settle itself into a demand for money; but, under thoroughly established rules, the fact that the amount claimed can be liquidated in cash does not deprive the federal courts of jurisdiction in equity. The subject-matter, it is true, is only gains and profits, but it is the gains and profits arising out of a trust as courts of equity define trusts, express or constructive; and therefore, although it sometimes happens that there is a concurrent

remedy at law where a trust has worked itself into cash, yet in the federal courts the remedy in equity always remains. Indeed, if the propositions of the complainant in this case can be sustained, the common law would be incompetent to give it a remedy, because its eye is not keen enough, nor the reach of its arm long enough, to work out the legal complications arising out of the series of events which are alleged to have occurred. It is hardly necessary to cite authorities on this proposition, but it is well enough to refer to Taylor v. Benham, 5 How. 232, 274, 12 L. Ed. 130, National Bank v. Insurance Company, 104 U. S. 54, 67, 26 L. Ed. 693, and Clews v. Jamieson, 182 U. S. 461, 479, 21 Sup. Ct. 845, 45 L. Ed. 1183. The case in this respect is entirely unlike Root v. Railway Company, 105 U. S. 189, 26 L. Ed. 975, and others of analogous classes, where the original right exists not in equity but at law.

It will appear that two gentlemen who are out of the jurisdiction of this court, and on whom service has not been made, were constituted co-sharers with the respondent in the trust alleged in the bill. Their absence, however, does not affect our jurisdiction. The claim made against the respondent, Rogers, is for gains and profits in which the others associated with him did not share, for which they are in no way sought to be held responsible, and in which they can have no part either by liability to contribute or by compelling contribution from Rogers. On the record, they have no interest in the questions involved, and the substantial issue is wholly between the complainant and the respondent. Therefore, especially in view of section 737 of the Revised Statutes [U. S. Comp. St. 1901, p. 587], and of Equity Rules 22, 47, and 53, no objection to our taking jurisdiction arises on this score. Story's Equity Pleading, § 161.

Some minor defenses which do not touch the merits of the controversy can easily be laid aside at this stage, although before stating the substance of the complainant's case. One is that the equity— that is, the cause of action which chancery recognizes—does not lie with the complainant, the Bay State Gas Company of Delaware, but with sundry local corporations at Boston, to be referred to hereafter. We are unable to see any basis whatever for this proposition. and think we need not discuss it. It is also stated in effect that, whatever position the respondent, Rogers, occupied with reference to the subject-matter of the litigation, the co-sharers of whom we have spoken were jointly responsible with him, and that, as stated at large, he (Rogers) was under no obligation to compel these or any other associates to continue as such, and that he therefore was not liable for their failing to so continue. No possible liability of that nature is in any way involved in what is demanded by the complainant, which is, as we have already said, gains and profits received by the respondent, Rogers, in which no other person was concerned. It is also urged on us that the gains and profits which the complainant seeks to recover were received by the respondent, Rogers, on December 10, 1897, while the present litigation was commenced on July 3, 1903, not quite six years subsequently. Therefore, the respondent makes a claim of laches; but the demand is purely a money demand,

which would not be barred by the statute of limitations at law, and therefore not concurrently barred in equity, unless there may be some peculiar basis in reference thereto. We do not perceive that any such basis exists. As the complainant makes its bill, there is no ratification or waiver, because the peculiar facts on which it rests its claim were not known until after the receiver was appointed, which was in June, 1903. Neither are there any elements of estoppel, nor any intervening occurrence which would prejudice the respondent on account of the delay, so far as we can perceive. Moreover, this bill was brought by a corporation which was strictly a cestui que trust against a respondent who was strictly a trustee. In equity such relationship always creates a dependent situation, so that, as between trustees and cestuis que trustent, laches can hardly ever be said to afford a defense unless from the time when the facts are fully known and understood; a condition which, as applicable to the complainant's allegations, did not exist until after the present receiver was appointed. Therefore, we are clear that none of these minor defenses are available to the respondent.

The principles of law applicable to this proceeding are simple and familiar. The facts also resolve themselves very easily on a single proposition. On the other hand, the proofs offered in the record are very voluminous, and the facts leading up to the single crucial question involved, and following it, as told by the parties, are numerous, and protracted over a long period of time. To undertake to state the history of the case as given us with full justice to one side and the other would require a very elaborate opinion, which, so far as we can perceive, would be of no substantial advantage. Therefore, beyond stating the case as shown by the complainant's bill, we are of the opinion that it may best be disposed of by a few propositions. The bill, after it was filed, was amended, and the complainant has furnished us with a new draft, as it claims it stands after being thus amended. We are satisfied that this draft is substantially correct for all the purposes for which we are required to use it. Some abbreviations are used in the bill which we will avail ourselves of in this opinion. Omitting some portions, which are unnecessary for us to repeat, the bill is as follows:

"On or about October 31, 1896, there existed a corporation known as the Bay State Gas Company of New Jersey, hereinafter called the 'New Jersey Company,' which had been organized under the laws of the state of New Jersey, and had been in existence for some years. The capital stock of said New Jersey Company was $1,000,000, consisting of 10,000 shares of the par value of $100 each, and approximately every one of said shares was owned and held by the Bay State Gas Company of Delaware, hereinafter called the 'Delaware Company.'

"On said thirty-first day of October, 1896, there were existing four corporations doing business in the city of Boston, commonwealth of Massachusetts, and there engaged in the manufacture and distribution of illuminating gas, said four corporations being named, respectively, the Boston Gaslight Company, South Boston Gaslight Company, Roxbury Gaslight Company, and Bay State Gas Company of Massachusetts. Practically the entire capital stock of said four companies, hereinafter called the 'Boston Companies,' had been deposited with the Mercantile Trust Company, a bank-

147 F.—36

ing corporation doing business in New York City, and were held by said trust company under a certain agreement to secure the payment of principal and interest on two issues of bonds of the New Jersey Company, known as 'Boston United Gas Bonds,' first and second series, said series of bonds amounting to several millions of dollars.

"Subject to the aforesaid lien, the New Jersey Company was the owner of the said stocks of the Boston Companies, and under the terms of said trust agreement the power to nominate and cause the election of directors and other officers of the said Boston Companies was reserved to and vested in the New Jersey Company. Such ownership and power were of great value, and were on said thirty-first day of October, 1896, practically the sole asset of said New Jersey Company, and absolutely the sole asset which gave value to the said stock of said New Jersey Company. By the ownership of its said stock of the New Jersey Company, the Delaware Company was able to, and did, manage and control the said Boston Companies, and had for several years managed and controlled said Boston Companies, and said Delaware Company was practically the sole owner, either by direct ownership or through the New Jersey Company, of all said stocks of the Boston Companies, subject to the aforesaid pledge of the same to the Mercantile Trust Company.

"On or about October 31, 1896, the Delaware Company appointed the defendant, Rogers, with two associates, as trustees to manage and control the said Boston Companies for its interest and benefit; and to effectuate such power and privilege and secure to said Rogers the absolute management and control of said Boston Companies, deposited with and conveyed to said Rogers and his associates all the capital stock of said New Jersey Company owned by it; and said Delaware Company thus actually transferred to said Rogers and his associates the management and control of all said Boston Companies, and the power to nominate and elect directors and other officers thereof precisely as if he, the said Rogers, and his associates were the actual owners of all the capital stock of the Boston Companies. The terms of said trust were set forth in a deed of trust dated October 31, 1896, duly delivered to and accepted by said Rogers and his associates. A copy of said deed of trust is hereto annexed marked 'Exhibit C.' and made a part hereof. The defendant. Rogers, and his associates thereby became bound to manage and control said Boston Companies in the interest and for the benefit of the Delaware Company.

"The defendant, Rogers, thereafter immediately requested the resignation of the directors and controlling officers of said Boston Companies, and caused the election and substitution therefor of persons not interested in said Boston Companies as stockholders or otherwise, but who would be, and thereafter proved to be, subservient to said Rogers, and willing and ready to execute and carry out all the wishes and commands of said Rogers in connection with said company, and thereby said Rogers, by the election of said directors subservient to him, came into absolute management and control of said Boston Companies.

"At the date of said trust agreement (Exhibit C), to wit, October 31, 1896, said Rogers was the owner of a controlling interest in two corporations known as the Brookline Gaslight Company and the Dorchester Gaslight Company, said corporations being organized under the laws of the commonwealth of Massachusetts, and being engaged in the manufacture and sale of illuminating gas in the city of Boston. Both of said corporations, being under the control and domination of said Rogers, had for some years been engaged in keen competition and rivalry with said Boston Companies, and more especially the Boston Gaslight Company, which competition and rivalry between said companies had caused great loss of profits, not only to the Boston Companies, but to said Brookline Gaslight Company as well.

"On or about September 30, 1897, an association known as the New England Gas & Coke Company was organized for the purpose of manufacturing coke by the Otto Hoffman process, so-called. and producing by-products in connection therewith, including a very large amount of fuel and illuminating gas. It was a part of the plan of the organizers of said company that its

manufacturing plant should be located in the vicinity of the city of Boston, and they considered it necessary to the success of the enterprise that a market should be found in said city for the sale of the gas to be manufactured by said company as a by-product. About the time of the organization of the said Coke Company, or shortly thereafter, the managers, or certain persons representing the said company, with the object of carrying into effect their said plan, approached the defendant, Rogers, and opened negotiations with him for the purpose of securing contracts with all the companies owned or controlled by said Rogers in and about the city of Boston for the sale to them by said Coke Company of gas to be thereafter manufactured by it, in such quantities and for such long periods of time as would warrant the construction by said Coke Company of an expensive plant and works. The plaintiff is informed, believes, and therefore alleges, that the defendant Rogers declined to cause the execution by said companies owned or controlled by him of such contracts for the purchase of gas from said Coke Company, except upon condition that said Coke Company should purchase from him all his interests in the Boston gas field; that thereupon the said Coke Company, in order to secure the desired contracts for the sale of its gas, was obliged to and did enter into an oral agreement and undertaking with said Rogers some time in November, 1897, substantially in terms as follows:

"'(a) That said Rogers should cause not only the Dorchester and Brookline Companies, owned and controlled by him, but also the four Boston Companies, to enter into contracts to buy gas from said Coke Company for the period of fifty years, through the medium of the Massachusetts Pipe Line Company, a subsidiary company owned and controlled by the Coke Company.

"'(b) That said Rogers should convey and transfer to said Coke Company, or its order, the following securities:

"'18,500 shares of the capital stock of the Brookline Gaslight Company; 5,170 shares of the capital stock of the Dorchester Gaslight Company; certificates of indebtedness of said Brookline Gaslight Company, amounting to $1,615,000 par value, and Boston United Gas Bonds, First Series, to the amount of $1,000,000, being substantially the same property which he had offered to sell, and upon which he had given an option, as aforesaid, for the sum of $6,062.061.08.

"'(c) That said Coke Company should pay to the defendant, Rogers, or cause to be paid to him, the sum of $8,053,103 cash, $1,000,000 par value of the bonds of the said Coke Company, and $400,000 par value of the stock of said company. And

"'(d) That upon the payment of the said sum of money and the delivery of said securities to said Rogers, ostensibly as the consideration for said property owned by him, he would, through the exercise of his power as trustee for the Delaware Company, turn over the practical control and management of said Boston Companies to the said Coke Company by causing to be elected as directors of said Boston Companies persons nominated by and in sympathy with said Coke Company.'

"Pursuant to said agreement and understanding, the said Rogers, some time in December, 1897, did in fact cause to be executed by said Boston Companies, as well as by the said Brookline and Dorchester Companies, and delivered or caused to be delivered, contracts providing for the purchase for a term of fifty years from the said Coke Company of the gas to be manufactured by it; also assigned and delivered to said Coke Company, or its representatives on its behalf, all of the said securities owned by him, as aforesaid; and passed the control of said Boston Companies to the said Coke Company by resigning himself, and causing the other directors thereof to resign, and by selecting as his and their successors persons nominated by and identified with said Coke Company.

"In further pursuance of said understanding and agreement, the said Rogers was, on December 10, 1897, by the said Coke Company or its representative, paid the full consideration therein provided for, namely, the sum of $8,063,102.44, which included interest, in cash, the first mortgage bonds

of the Coke Company of the par value of $1,000,000, and stock of said Coke Company of the par value of $400,000. The said bonds and stock were of great value, and were subsequently sold by the defendant Rogers for sums aggregating over $950,000.

"The fair market value of the said securities at the time they were sold, as aforesaid, to the Coke Company did not exceed the sum of $6,000,000, and the defendant Rogers could not at· that time have secured from the Coke Company a larger sum therefor if he had not, through the use of his power of control as trustee for the Delaware Company, caused the said Boston ·Companies to enter into said fifty-year contracts with the said Coke Company, and undertaken to turn over the control of said Boston Companies · to the said Coke Company in manner as aforesaid. The plaintiff therefore avers that all of the said consideration over and above the fair market value of the said securities was in reality paid to the said Rogers by reason of his said position as trustee for the Delaware Company, and in consequence of his improper use of said position for the benefit of the said Coke Company in manner as aforesaid.

"The plaintiff, further is informed and believes, and therefore avers, that ·said cash consideration paid to defendant, Rogers, by the said Coke Company, in manner as aforesaid, was loaned the said Coke Company for this purpose by a syndicate represented by the Central Trust Company of New York, and of which the defendant, Rogers, was a member : that the said syndicate loaned to the said Coke Company the sum of $12,000,000, which included the sum paid as aforesaid to the defendant, Rogers, and received from the said Coke Company, in addition to the interest on said loan, as a consideration or bonus for making the same, stock of the said Coke Company of the par value of $2,400,000 ; that out of said stock the defendant, Rogers, received as a part of his share of the profits of said syndicate shares ·of the par value of $1,200,000, which he subsequently sold for prices amounting in the aggregate to $360,000 ; and that the defendant, Rogers, by reason of his participation in said syndicate, subsequently (namely, on September 25, 1899) received from the said Coke Company, through the said Central Trust Company, the sum of $254,087.46. · The plaintiff is advised and believes, and therefore avers, that the said sums, amounting to $614,087.46; ·should be considered as additional profits derived from the foregoing transactions by the said defendant, Rogers, through the improper use of his position as trustee for the Delaware Company.

"Wherefore the plaintiff prays :

"That a decree be entered against the defendant ordering him to pay to the plaintiff the sum or sums received by him as· trustee of the Delaware ·Company, or by reason of his position as such trustee, from the New England ·Gas & Coke Company, or by its procurement, with interest thereon, and for such other relief as the case may require or admit of."

Exhibit C, the instrument of trust referred to in the bill in equity, is as follows:

### "Trust Deed Made by New Jersey Company.

"This deed of trust, made this 31st day of October, 1896, by and between the Bay State Gas Company of Delaware, a corporation duly organized and existing under and by virtue of the laws of the state of Delaware, party of the first part, and Henry H. Rogers, John G. Moore, and Frederick W. Whitredge, citizens of the state of New York, jointly as trustees, parties of the second part,

"Witnesseth: That whereas the Bay State Gas Company of Delaware is the owner of approximately $1,000,000 par value of the capital stock of the Bay State Gas Company of New Jersey, and whereas the Bay State Gas Company of New Jersey has, by virtue of a certain deed of trust, dated January 1, 1889, made by and between J. Edward Addicks and William E. L. Dillaway, parties of the first part, the Mercantile Trust Company of the .city of New York, party of the second part, and the Bay State Gas Company of Delaware, parties of the third part, certain powers in respect to

the designation of persons to be elected directors of certain gas companies in the city of Boston, Mass., and set forth in the last-mentioned deed of trust; and

"Whereas, numerous suits in equity and other actions have from time to time been brought against said Bay State Gas Company of Delaware, and the Bay State Gas Company of New Jersey, and are threatening to be brought against the gas companies in the city of Boston, the equity in the stocks of which are owned by the said Bay State Gas Company of New Jersey and Delaware; and

"Whereas, receivers were, on or about the 16th day of October, 1896, appointed in said suits by said Bay State Gas Company of Delaware in the state of Massachusetts, New York, New Jersey, and Delaware, and various injunctions and other restraining orders have been from time to time obtained in said suits; and

"Whereas, the result of the proceedings last mentioned has been to cause a large depreciation in the price of the securities known as the Boston Gas bonds; and

"Whereas, the effect of such proceedings is to hamper the operation of the companies, and will probably bring about a default in the payment of interest upon the first and second series of said Boston United Gas bonds, which will result in a foreclosure of the deeds of trust or the mortgage securing the same, and ultimately result in the destruction of the equities in the stocks of the Boston Gas Companies owned by the Bay State Gas Company of Delaware; and

"Whereas, an arrangement has been made by which all of the said suits are to be discontinued, and the orders of injunction and for the appointment of receivers made therein are to be vacated upon consent; and

"Whereas, it is the term and condition of such arrangement that the control of the management of the Boston Gas Companies above referred to shall hereafter be vested in the parties of the second part—

"Now, therefore, this agreement witnesseth:

"First. That for the purpose of perfecting such arrangement, securing such control, and saving the interest of the Bay State Gas Company of Delaware in the equities of the said stocks of the Boston Companies from destruction, the said Bay State Gas Company hereby assigns, transfers, and sets over unto said parties of the second part 10,000 shares of the capital stock of the Bay State Gas Company of New Jersey in trust until such time as the Boston United Gas bonds of the first series shall have been retired by the operations of the sinking fund or otherwise paid off.

"Second. The parties of the second part agree to hold the shares of stock of the said Bay State Gas Company of New Jersey in trust for the Bay State Gas Company of Delaware, and to return the same to it when the Boston United Gas bonds above referred to shall have been paid.

"It is understood and agreed that in the event of the resignation, death, or incapacity of either of the trustees, his or their successor may be appointed by the survivors.

"The Bay State Gas Company, Delaware,
"By its President, J. Edward Addicks.

"Attest: **W. H. Miller**, Sec."

We omit from further consideration the special claim in the closing paragraphs of the bill as to certain sums amounting to $614,-087.46, as we are unable to perceive that anything in the record sustains the proposition that this was in any way connected with the use of the respondent's position as trustee of the Delaware Company; but, so far as we can discover, the matter related entirely to the operation of an independent syndicate, which was formed for the benefit of all concerned, and as to which the respondent was entitled to occupy the same position and relation as the other gentlemen involved

in it, without any liability to account to the complainant or to any one else by reason thereof.

The proofs in the record sustain all the propositions of the bill except those to which we will especially refer. The respondent maintains that the trust created by the instrument of October 31, 1896, was merely a naked trust, otherwise a mere voting trust, and that by the very nature of the trust it was necessarily shared by the respondent's co-trustees in all particulars; and that further, by its nature, is was impossible for the respondent to convert it into an active trust either with or without the aid of his co-trustees, by which either he alone or he and his co-trustees could put themselves in practical control of the Boston corporations, as alleged in the bill. But, by the clear terms of the instrument, the trust was an active and a responsible one, because by its letter "the control of the management of the Boston Gas Companies" was "vested in the parties of the second part"; that is, Mr. Rogers and his associates. The record puts it beyond doubt that during the period covered by the bill the control and the management of the Boston Gas Companies were practically assumed and exercised by the respondent, Rogers, undoubtedly by the consent of his co-trustees, with only nominal interference on the part of either of them. It is not, however, important whether all three trustees united in this practical control, because the liability of the respondent, Rogers, to account for gains and profits received by him alone for his sole benefit would, as we have shown, be precisely the same whether the control was exercised jointly with the co-trustees, and whether the opportunity to obtain gains and profits was shared with them or not, so far as there was sufficient opportunity for him to secure them, as alleged in the bill. That there was in fact an active trust of the kind alleged by the complainant, and that the relations of Rogers to that trust were of such character as to afford an opportunity of securing the gains and profits alleged by the bill, provided the New England Gas & Coke Company, or the gentlemen interested in it, were willing to assent to an arrangement out of which the gains and profits could be derived, are all too clear on the proofs in the record to require further discussion or development by us.

It is necessary, in order to understand the relations of the parties thereto, that it should be stated that the instrument of October 31, 1896, was the result of an antagonism between the Boston Gas Companies and the respondent, as a consequence of which he obtained the control of the Brookline Gas Company, which corporation, by reason of its authorized capacity to parallel, to a certain extent, if not throughout, the gas supply lines of the Boston Companies, was possessed of certain advantages. The respondent, in his explanation of the amount which he received for the securities of that corporation, speaks of its strategic position, and he says that the purposes of the Coke Company with reference to supplying gas, not only to Boston, but to other cities and towns, would have been materially enhanced by securing the control of "the dominating company in Boston and Brookline." The words in quotation marks are as used by the respondent,

but he adds that the Coke Company purchased his securities "upon terms that were satisfactory to him and to them." The possible command which the Brookline Company had over the entire field of gas supply in the locality, including the city of Boston, was made practically evident from the fact that it was through the securing of its control that the respondent, Rogers, compelled the termination of the antagonisms by the deed of trust of October 31, 1896, making him and his associates masters for the long period stated therein of the whole situation, subject, nevertheless, so far as the Boston Gas Companies were concerned, on the part of himself and his associates, to all the far-reaching obligations of an active trusteeship which equity placed on him and them. Apparently, therefore, without having first resigned the trust, Rogers, as one of the trustees, was prohibited from making use, to the disadvantage of the Boston Gas Companies, of the strategic position of the Brookline Company, and from passing the control of that corporation into the hands of others without providing the proper protection against the possibility of the resumption of the hostile attitude. As this bill is drawn, however, we have no occasion to follow this suggestion further.

As we will state further on, there can be no question that, notwithstanding the trust under the agreement of October 31, 1896, the respondent, Rogers, so far as concerns anything claimed in this bill and appearing on this record, might have sold his interests in the Brookline Company without being accountable for any part of so much of what he might have received therefor as would represent his investment and an ordinary, reasonable return on the same. We do not mean by this merely such a return as would be expected to come from what are known as strictly investment securities, but such a return as might reasonably be expected from an investment like the respondent's in the Brookline Company, if successful, having in view compensation for the possibilities of loss which such investments involve.

While we reserve the right to review our findings on the coming in of the report of the master, we are of the present opinion that the amounts received by the respondent, Rogers, for his Brookline securities was in excess of any value which we have described; and that that amount was enhanced by reason of the fact that, in the position of things, the breaking up of the trust, as it was in fact broken up by the respondent's disposing of his securities and what immediately followed that disposition, together with the power which the control of the Brookline securities carried with them with regard to the entire gas field in question, brought the respondent a considerably larger return than he otherwise would have received. We will not at this point undertake to consider the matter further, as we can make our position clearer later, except to say at the outset that the facts disclosed by the record cannot in any event entitle the complainant to recover as gains and profits such entire excess, but only its equitable proportion thereof.

At this point it becomes necessary to state that the record shows no basis whatever for the allegation in the bill that the respondent,

Rogers, sought to secure the management and control of the Boston Companies in order that thereby he might, in connection with the sale of his interests in the Brookline and Dorchester securities, secure a large compensation and profit for himself. On the other hand, the arrangement out of which grew the instrument of October 31, 1896, is clearly shown to have been made in good faith and for the interests of all concerned, in view of the condition into which the respondent, Rogers, had been able, without any violation of any obligation, to force the so-called gas field in that locality. The power which he was able to exercise was evidenced by the fact that the control of the entire field was, by his holding of the Brookline and Dorchester securities, in connection with the instrument of October 31, 1896, placed with apparent confidence in the hands of himself and his associates. Therefore, it is that we say that practically in any event, so far as this bill is concerned, the respondent is entitled to receive and retain the first cost of the securities which he owned, plus an ordinary, reasonable return thereon, as we have described it. When the respondent had, by making that investment, placed himself in the position such as the record shows he was able to occupy by the consent of the complainant itself, and such as to enable him to receive for his property a sum, as alleged by the complainant, largely in excess of the original cost and an ordinary, reasonable return thereon, it certainly cannot be said that there would be any equity in throwing on him a loss; and to deprive him of his original investment and an ordinary, reasonable return thereon would inflict a loss, in the proper mercantile sense of the term.

The bill for the most part is rested squarely on the proposition that the respondent, Rogers, in his negotiations with the Coke Company expressly made all dealings, so far as concerned the Boston Gas Companies, conditional on the purchase by the Coke Company of the respondent's interests in the Brookline securities; in other words, it expressly alleges and makes it the gravamen of the case that the respondent, Rogers, refused to allow the Coke Company to deal with the Boston Gas Companies except under the condition of purchasing his Brookline securities at a price fixed by him. Of course, such a position on the part of the respondent would be a clear breach of a still existing trust, and might entail on him an accounting of all gains and profits as claimed by the complainant. There was, indeed, a series of facts happening contemporaneously which fully justified the complainant in putting on foot the investigations which culminated in bringing this bill in the more specific form in which it is presented to us. Those investigations showed a series of events which might well suggest the theory on which the bill mainly rests. The negotiations with the Coke Company for the contracts with the Boston Gas Companies and the negotiations between the respondent, Rogers, and the Coke Company for the sale of his holdings in the Brookline Company were proceeding to a certain extent apparently contemporaneously, and there was apparent ground for the suggestion that the respondent, Rogers, by his controlling position as a trustee, held up the completion of the contracts with the Boston Gas Companies until the

contract of sale of his Brookline securities had been practically, if not actually, consummated in all particulars. There was also the further fact that, immediately after the consummation of all the negotiations, the personnel of the management of the various Boston Gas Companies, as well as of the Brookline Company, was changed substantially, if not entirely. There was also the further more urgent fact that it is quite difficult to understand why the Coke Company, which was all along struggling to come into existence, meeting, as the record shows, with great difficulty in its incipiency, should load itself up with a mass of securities like those of the Brookline Company, involving several millions of dollars, at a price on which the income from the securities purchased could not meet the current rates of interest; although it is, indeed, true that it is difficult to reproduce the governing considerations existing nearly 10 years ago in the minds of the gentlemen involved in an enterprise like that of the Coke Company, and it may also be true that inducements to the purchase of the Brookline Company securities may be explained by the fact that the ramifications were so peculiar that the purchase gave the Coke Company the use of $1,000,000 of securities at a time when it especially needed it, besides gaining the strategic position of the Brookline Company, as said by the respondent. Nevertheless, however all these things may be, and however suggestive in favor of the complainant the peculiar facts to which we have referred, and however much they would help the complainant if other proofs in the record tended to sustain it, the fact is there are no such other proofs; and the case as made by the bill in the particular way which we have explained must fail, because the complainant does not sustain the burden resting on it. In the eyes of the law what is not proven does not exist. Macmillan, a witness called by the complainant, was such a factor in the negotiations with the respondent for the sale of his Brookline securities, and also was such a factor in the organization and control of the Coke Company, that it is impossible to conceive that there could have been such an express understanding as alleged in the bill without his being practically and fully cognizant of it; and yet Macmillan positively, fully, and clearly denies its existence. The record shows him to be a man of large experience and unquestioned character, understanding and comprehending fully what he was testifying about. He was called by the complainant and is appealed to by both parties. He is unimpeached, and, so far as the record is concerned, an unimpeachable witness. Searching the record by and large we are unable to find anything, singly or together, which can contravene his testimony; and we are therefore compelled to find that, on the bill before us as it more largely rests, the complainant fails.

So far we have found no difficulty in our conclusions except on the question whether the bill necessarily takes on merely the character which we have described. The transaction has other phases than those which rest on the express arrangement thus alleged to have been entered into by the respondent trustee. He voluntarily assumed the trust, and linked with it his own interests, and therefore he was bound to protect the cestui que trust, although he was authorized

to protect himself so far as he could do so without a breach of his trust obligations. The rules in reference to trust obligations have never been carried too far by the chancellors, and it is not too much to repeat the language of Perry on Trusts (5th Ed.; 1899) § 427, as follows:

"All the power and influence which the possession of the trust fund gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustee. No other rule would be safe, nor would it be possible for courts to apply any other as between trustee and cestui que trust."

The arm of ·the chancellor is so long, and his sight so keen, that it is never possible to frame specific circumstances for him in advance, and specific rules to meet the varying fluctuations of human affairs. Therefore, it is often more easy to appreciate what equity would accomplish after the facts have been made known, than to define it by general rules, or in any way to put it into, words in advance. The powers of the equity courts are never absolutely controlled by apparent analogies, but perhaps the position into which parties who subject themselves to their jurisdiction are brought is exhibited more strikingly by analogy to those before us than elsewhere by the following extract from an opinion passed down by the judge now presiding in Western Union v. American Bell, 125 Fed. 342, 346, 347, 60 C. C. A. 220, 224, 225:

"In contemplating the construction and effect of the contract, we must first of all consider that the relations of the parties to it were of the fiduciary character to which we have referred; so that the telephone company, as the sole holder of the joint interests, left in exclusive control thereof, was bound to the underlying rule that neither directly nor indirectly, nor by any artifice whatever, should the Western Union be deprived of its share in the net profits of the licenses or leases, whatever form they might assume, unless and except as expressly so provided. In Batchelder & Lincoln Company v. Whitmore, 122 Fed. 355, 361, 58 C. C. A. 517, we illustrated how such fiduciary obligations may arise between others than technical trustees and cestuis que trustent, pointing out that the utmost good faith is required between creditors coming into a composition of a failing debtor. The existence of similar obligations under other circumstances, as between copartners, and also as between officers of a corporation and the corporation, is explained in Pomeroy's Equity Jurisdiction, §§ 157, 1088, and sequence, although it is shown that under such circumstances jurisdiction in equity does not lie to the same extent as with technical trusts. It is also true that, other than with a technical trustee, this contract left a large discretion with the telephone company, and did not bind it to any particular rule of diligence or skill. Nevertheless, this general equity requires it to account with the utmost good faith for what concerns the common interests. This equity is effectual, universal, and unyielding, and we must approach the contract in the light of it, and give the Western Union the full benefit thereof."

On the one hand, we have no occasion to deal with any questions as to what the obligations, rights, and liabilities of the parties would have been in the event the respondent, Rogers, had seasonably resigned his trust, giving such notice of his purpose in reference thereto as the law might require, and a reasonable opportunity to the complainant to meet the emergency arising therefrom. On the other hand, while the record shows an apparent general insolvency on the part of the complainant and of the Boston Gas Companies, the cause

thereof has not been brought to our attention; neither has it been brought to our attention that the contracts made with the Coke Company in behalf of the Boston Gas Companies was to their detriment. Moreover, the record raises the suggestion that the mere fact that these contracts were made was for the advantage of all concerned therein. Certainly the record does not disclose to us that Rogers, the respondent, was guilty of any breach of trust so far as the making of these contracts was concerned, or could have been held responsible as for an equitable tort in reference thereto. Moreover, as we have already said, the purpose of the bill is for an account of gains and profits, so that we have no occasion, as we have again already said, to investigate any question of damages arising out of any possible equitable torts, if there had been any; but we must deal only with the division of gains and profits arising out of the transactions to which this bill relates. So far as this bill is concerned, the expressions we have cited from Perry on Trusts have a sweeping application, and certain expressions in what we have extracted from Western Union v. American Bell are particularly in point. For example: "That the sole holder of the joint interests left in exclusive control thereof" is "bound to the underlying rule that, neither directly nor indirectly, nor by any artifice whatever, can the beneficiary or" the cestui que trust "be deprived of his share in the net profits of the result of the working out the joint interests"; and also the expression that this general equity requires an accounting "with the utmost good faith for what concerns the common interests," and "is effectual, universal, and unyielding." We also may justly make a close application of what we have cited from Perry on Trusts, to the effect that "all the power and influence which the possession of the trust fund gives must be used for the advantage and profit of the beneficial owners"; and we may add that the well-known rule stated in the same edition of Perry on Trusts, in section 428, also applies here, that where the common properties of the trustee and cestui que trust have been dealt with together, the burden rests on the trustee to vindicate the transaction, and that the court can be relied on to scrutinize it with great severity. The underlying rule which controls our decision is based on the same fundamental principles as the rule in United States v. American Surety Co., 126 Fed. 811, decided by the Circuit Court for the District of Maine on December 22, 1903, and affirmed by the Circuit Court of Appeals for this circuit in 135 Fed. 78, wherein it was held that the United States, having consented to make themselves quasi trustees by accepting a statutory bond for the benefit of themselves and sundry individuals who might become creditors, were holden to share pro rata, although ordinarily entitled to priority. The same observation applies to the class of cases of which Bradley v. Farwell, Holmes, 433, Fed. Cas. No. 1,779, is an excellent example, in which it was held that, as the directors of a corporation are quasi trustees for all concerned, they could not obtain any priority over other creditors by accepting for debts due them security from the corporation when known by them to be insolvent or on the verge of insolvency.

To apply the language of Western Union v. American Bell to the case at bar, the respondent was, for all practical purposes, as we have already decided, the holder of the joint interests, "and had been left in exclusive control thereof." The interests had been linked together for the general good of each, and purposely so linked. So to speak, he did not hold his own interests in one hand and the interests of the complainant in the other, but both in the same hand. Without surrendering his trust; without any notice which the record discloses; without relieving the complainant from its tutelage, so that it became its own master; and without furnishing it with any opportunity of sharing in any profits which he might acquire by disposing of a portion of the property thus linked together; without any effort to ascertain whether, as the result of dealing with one of the interests which had so been joined, the complainant had any equity in the profits which might be derived therefrom, and, if yes, what equity; dealing, moreover, with parties whose purpose was to acquire rights with reference to the entire field to which the joint holdings related, and therefore with reference to the entire joint holdings; and although, as he well knew, the Coke Company was negotiating in fact for all the several parts of the entirety, and almost simultaneously completed all their dealings with regard thereto—the respondent claimed and received for himself the entirety of the gains and profits so far as any gains and profits immediately resulted. Under these circumstances, equity deals with the actual condition of things, and with the relations of the parties, with little reference to their express purposes. In this way arose the masterful rules of equity with reference to exoneration, contribution, and subrogation, as to each of which there are for the most part no purposes expressed, and, at the best, there is involved what the law calls "implied contracts," which, for a large part, are no contracts at all. The reasons for this are patent, especially as applied to the case at bar, where a trustee, in dealing simultaneously, or almost simultaneously, with his own interests, deals also with those which he holds in trust. With simultaneous negotiations relating to a common result, although not expressly linked together, it is not within the power of human nature to pick out all the strands, or to ascertain what are concealed, or to delineate all the motives and considerations which induce and control the mind of one who is acting in a twofold capacity. While, as we have already said, all the refinements of such a condition are not easily understood or put into words, a somewhat bald illustration would make clear the wisdom and justice of the result which equity reaches under circumstances like those before us. For example, suppose the guardian of a minor, appointed by an orphans' court, holds in his own right certain portions of a water privilege and of the land surrounding it, and also controls as guardian of the minor other portions of the same privilege and of the land surrounding it, the two together completing the field which a promoter would desire to acquire as a whole, and the two so linked together that one would be less valuable without the other. Carrying the hypothesis further, and suppose that, on being approached by a purchaser, the guardian sug-

gests that the purchaser first acquire his own individual interests at a price named by him, yielding a large profit, and that this is done, and that afterwards the interests of the minor are ,sold for an ordinary price to the same purchaser, and as an ultimate part of the enterprise which is being promoted, could it be doubted that, under such circumstances, not only the equity courts and the orphans' court, in accordance with their rules, would order an investigation and an accounting, but that the ordinary mind of the intelligent man in the community would pronounce the course of dealing one which demanded a probable division of profits?

While in the case supposed the relations of the parties would be of such a character that judgment would be plainly pronounced, the rules applicable are precisely the same as in the case before us. The respondent, Rogers, was the master so far as his own interests were concerned, while the complainant's interests were in tutelage in the respondent's hands. In no particular, according to the rules of equity, is there any difference in principle between the case supposed and the case at bar. Indeed, the evidence offered by the respondent affords positiveness to this illustration. Burrage, called by him, testified that he was negotiating with reference to the subject-matter of these proceedings with the representatives of the Coke Company, having a number of interviews with Macmillan, whom we have already spoken of, and others; and, as we understand the record, he opened the negotiations in behalf of the respondent, Rogers.

We may say here that sometimes in the course of the opinion we have spoken of both the respondent's interests in the Brookline Company and in the Dorchester Company, and sometimes we have named only the Brookline securities: but, however this may be, we intend by our observations and our findings to cover the entire interests of the respondent, Rogers, disposed of by him as alleged in the bill.

Burrage testified further as follows: "They stated to me the plan they had in mind of establishing a coke company gas by-product plant near Boston, and of supplying gas to the district." By "the district" undoubtedly was intended, not only that covered by the Brookline and Dorchester Companies, but that covered by the four Boston Companies, so that. at the outset, respondent, Rogers. through his representative, Burrage, understood that the result of the negotiations was to be an entirety, if it could be accomplished, in behalf of the Coke Company; that is, that it related to the entire field, even though it was to be gathered together step by step, by separate threads, or otherwise by separate parcels. The witness testifies they stated to him that they believed the undertaking would be successful. He added:

"I stated to them that. under these circumstances, perhaps the best thing for them to do would be for them to buy the securities of the Brookline and Dorchester companies, and we thereupon took up negotiations for this purpose."

Here is a fact in all respects like the hypothetical case of the guardian and ward. With this introduction, who can tell the operation of the suggestion upon the minds of the parties to the negotiations?

Who can say, as it came from the respondent, Rogers, who held in the same hand his own interests and the others which the Coke Company expressly stated they desired to deal with, whether it was accepted merely as a suggestion or as a primary condition? No one can determine how a suggestion of this sort operated on the minds pro and con, and equity says no one need tell. It proceeds on broader grounds, and requires the respondent trustee to share with the cestui que trust the gains and profits of which, by his method of negotiation, they were barred from sharing, and barred even from a hearing with reference thereto. The pith of the whole is that, whatever may have been the motives of the respondent, Rogers, and although on the record he is not chargeable with the particular accusations on which the bill mainly relies, and even though he may have fairly supposed, according to the ordinary rules governing the relations of mankind, that he was entitled to make a sale of his securities without being liable to account therefor, yet, under the circumstances and for the reasons stated, the chancellor, sitting in equity, could not if he would shake off the conclusion that what was thus profited must be apportioned among all the common interests.

We have referred to the fact that the bill has been pressed on us mainly in another aspect, and that we doubted whether on its allegations it could be applied to the aspect which we have thus developed. We have been compelled to reject for want of proof, as we have explained, those portions of the bill that allege that the respondent, Rogers, sought the controlling position which he held for an improper purpose, or that he as it were "held up" the negotiations until his own securities were disposed of. But there remains the allegation "that all of the said consideration"—meaning the consideration which he received for his interests in the Brookline and Dorchester Companies—"over and above a fair market value of the said securities, was in reality paid to the said Rogers by reason of his said position as trustee"; and also there remains in the prayer for relief that he be decreed to account for what he received by reason of such disposition. As to the allegation, it might have been more aptly expressed with reference to the case as we have developed it; but, as we doubt not the facts are also fully developed, we should, if we deemed it necessary, allow the slight amendment which would be required to adapt it perfectly thereto. We, however, do not deem this necessary, but we think the allegation sufficient as it stands. While the prayer of the bill asks the entire profits received by the respondent, Rogers, and we are of the opinion only that he is liable to share with the complainant, it never has been regarded as a variance of any importance that the prayer for relief exceeded that to which the complainant in equity or a plaintiff in a suit at law was entitled. He may pray for the whole, and recover only a portion.

There are serious difficulties in determining upon what basis the gains and profits referred to should be shared between the complainant and the respondent; that is, what portion thereof should be retained by the respondent. The case having been pressed on us almost solely on the ground that the complainant was entitled to the entire profits,

the court has received no assistance from counsel in this particular. A master must be appointed, according to the views we have expressed, to report a scheme for a just and equitable apportionment. If none other can be found, it may be, and probably will be, necessary to resort to the field which courts who are unable to proceed strictly philosophically are often compelled to enter—that is, to the judicium rusticum—and apportion gains and profits half to each. On whatever sum may be allowed, interest should be added at a fair market rate.

We hold, therefore, that the respondent must account for an equitable proportion of the gains and profits received by him as alleged in the bill, subject to the view expressed in this opinion that he is in any event entitled to retain the original cost of his investments, and an ordinary, reasonable return thereon, as we have described it. We find that the respondent has received gains and profits largely in excess of what he is thus entitled to retain. We, however, direct the master to ascertain such original cost, and what would be such an ordinary, reasonable return thereon, computing the same with reference to what the respondent received for his securities, and we reserve the right to dismiss the bill in the event it should be finally ascertained that our summary computations in this respect have been erroneous. We also hold that the gains and profits should be apportioned upon equitable rules, as we have pointed out in this opinion, so far as the same can be ascertained; that if no definite rule is ascertained, they shall be apportioned half to the complainant and half to the respondent; and that the bill should be sustained, and a master appointed in accordance with the views herein expressed.

It is ordered, adjudged, and decreed that the bill be sustained for the purposes and to the extent shown in the opinion passed down this day; that Moorfield Storey, Esq., be, and he is hereby, appointed master to take the accounts and report upon such other matters as required by such opinion; and a certified copy of this decree and of the opinion shall stand as the commission to the master.